# Exhibit 23

Trials@uspto.gov
Tel: 571-272-7822

Paper 14
Entered: October 31, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

LEVEL 3 COMMUNICATIONS, LLC
Petitioner

v.

AIP ACQUISITION, LLC
Patent Owner

---

Case IPR2013-00296
Patent 7,724,879 B2

---

Before HOWARD B. BLANKENSHIP, JUSTIN T. ARBES, and JAMES B. ARPIN, *Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I. INTRODUCTION

Level 3 Communications, LLC ("Petitioner") filed a petition to institute an *inter partes* review of claims 1-15 (Paper 6; "Pet.") of Patent No. US 7,724,879 B2 (Ex. 1001; "the '879 Patent"). AIP Acquisition, LLC ("Patent Owner") filed a patent owner preliminary response (Paper 13; "Prelim. Resp."). We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD.—The Director may not authorize an *inter partes* review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition and patent owner preliminary response, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Petitioner would prevail with respect to claims 1-15 of the '879 Patent. Accordingly, pursuant to 35 U.S.C. § 314, we authorize an *inter partes* review to be instituted as to claims 1-15 of the '879 Patent.

## A. *Related Proceedings*

The '879 Patent is involved in concurrent district court litigation. On May 17, 2012, Patent Owner filed an action against Petitioner alleging infringement of the '879 Patent, *AIP Acquisition LLC v. Level 3*

*Communications, LLC*, Civ. Action No. 12-617 (D. Del.). Petitioner was served with the complaint in this action on May 21, 2012. Related district court litigation regarding the '879 Patent is: *AIP Acquisition LLC v. iBasis, Inc.*, Civ. Action No. 12-616 (D. Del.), filed May 17, 2012; *AIP Acquisition LLC v. Time Warner Cable Inc., et al.*, Civ. Action No. 12-01692 (D. Del.), filed December 11, 2012; *AIP Acquisition LLC v. Cox Communications Inc., et al.*, Civ. Action No. 12-01691 (D. Del.), filed December 11, 2012; *AIP Acquisition LLC v. Comcast Corporation, et al.*, Civ. Action No. 12-01690 (D. Del.), filed December 11, 2012; *AIP Acquisition LLC v. Cablevision Systems Corporation, et al.*, Civ. Action No. 12-01688 (D. Del.), filed December 11, 2012; and *AIP Acquisition LLC v. Charter Communications Inc., et al.*, Civ. Action No. 12-01689 (D. Del.), filed December 11, 2012. *See* Pet. 1-2.

### *B. The '879 Patent*

The '879 Patent relates to methods for allowing telecommunications services to operate over telecommunications networks (e.g., the Public Switched Telephone Network or "PSTN") and data networks (e.g., digital networks). Prelim. Resp. 2-3. For example, claimed methods allow the Internet, or another data network, to function like a telecommunications network. Ex. 1001, col. 6, ll. 36-38. Calling parties may dial remote locations for the price of a local access and service fee to have voice conversations with called parties in those locations and to avoid using long distance carriers. *Id.* at ll. 38-42. In order to make such calls, a local system

may be dialed via computer access or a regular telephone, which prompts the calling party for the called party's telephone number or other identification. *Id*. at ll. 42-44. The calling party then is connected to the called party over the Internet or another data network, such as by connecting the parties via a node through a local call or through other networks. *Id.* at ll. 44-47. For example, a calling party may access a node that converts the telephone transmission (e.g., the voice transmission) into data supported by the network chosen by the node. *Id.* at ll. 47-49. In this example, a network may connect to another node proximate to the called party that then converts the data transmission back into a voice communication and converts the voice communication into a local call to the called party with the called party node operated by an independent service provider located elsewhere, such as in another country. *Id.* at ll. 49-54.

A method, as recited in the challenged claims, is illustrated by the conceptual block diagram in Figure 9, reproduced below:




FIG. 9

In Figure 9 of the ’879 Patent, a conceptual block diagram depicts the principles of operation of the method, as recited in independent claim 1, for transmitting voice communications between a calling party and a called party over a data network or another network. *Id*. at col. 4, ll. 3-4; col. 14, ll. 27-45. The block diagram of Figure 9 provides an overview of the transmission flow between a calling party and a called party. *See id*. at col. 6, ll. 36-56. The calling party at a calling location 48 transmits a call to a calling party access device 12 via an intercept 16 over link 50A. *Id.* at col. 14, l. 62-col. 15, l. 3. Intercept 16 may be part of a central local node 18. *Id.* at col. 15, ll. 11-12. Local node 18 receives transmissions from access device 12, converts those transmissions from a first format (e.g., a

telecommunication protocol) to "an internet protocol" for transmission over a data network 20, and sends the converted transmissions over the data network 20 in order to establish and transmit voice communication for a phone call with a called party access device 14. *Id.* at Fig. 9.

As an alternative to communicating through data network 20, additional two-way direct link connections 46A-E are depicted. *Id.* at col. 14, ll. 29-36. Through these connections, calling party access device 12 may route communications to called party access device 14 via either a communications network 10[1] or another network 200, such as a cellular, Asynchronous Transfer Mode (ATM), or frame relay network. *Id.*; *see also* Ex. 1001, col. 7, ll. 34-39.

Access device 14 may receive the voice communication via a central local node 24 and/or a central office 22. *Id.* at col. 15, ll. 4-8. Central local node 24 and central office 22 may be separate components. *Id.* at col. 15, ll. 12-14. The transmissions are converted from the internet protocol to another format suitable for reception by access device 14, such as the telecommunications protocol from which the transmissions were originally converted. *See id.* at col. 4, ll. 34-42.

---

[1] In Figure 9 of Ex. 1001, communications network 10 is described as "voice network 10."

### *C. Illustrative Claim*

Challenged claim 1 is independent. Challenged claims 2-15 depend, directly or indirectly, from independent claim 1. Claim 1 is illustrative and is reproduced below:

> 1. A method for communication between two access devices via one or more networks, comprising the steps:
>
> receiving a transmission in a first format through a first communication network from a first access device, the first format comprising a telecommunication protocol for establishing and transmitting voice communication for a phone call in one of a digital telephone network, an analog telephone network, and a cellular network;
>
> performing a first conversion converting the transmission from the first format to a second format, the second format being an internet protocol;
>
> sending the converted transmission through a second communication network, the second communication network being a data network, for reception by a second access device; and
>
> performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device, wherein the first access device and the second access device comprise telecommunication nodes, and said further format comprises said first format or another telecommunication protocol.

*D. References Relied Upon*

Petitioner relies upon the following references:

| | | | |
|---|---|---|---|
| Gordon | US 5,608,786 | Mar. 4, 1997 (filed Feb. 13, 1995) | (Ex. 1005) |
| Iwami | US 5,604,737 | Feb. 18, 1997 (filed Dec. 13, 1994) | (Ex. 1006) |
| Kobayashi | US 5,337,352 | Aug. 9, 1994 | (Ex. 1007) |
| Chau | US 5,187,710 | Feb. 16, 1993 | (Ex. 1008) |
| Kammerl | US 5,051,983 | Sep. 24, 1991 | (Ex. 1013) |

Ian Merritt, PROVIDING TELEPHONE LINE ACCESS TO A PACKET VOICE NETWORK at 1-15 (1983) (available at Defense Technical Information Center, Accession Number ADA 126270) (Ex. 1009);

S. Casner *et al.*, *Wideband Communication*, 1982 ANNUAL TECHNICAL REPORT: RESEARCH PROGRAM IN COMPUTER TECHNOLOGY, March 1983 at 1-11, 85-97 (available at National Technical Information Service, Product Code ADAl27288) (Ex. 1010);

G.C. O'Leary *et al.*, *A Modular Approach To Packet Voice Terminal Hardware Design*, 50 AFIPS CONFERENCE PROCEEDINGS, May 1981 at 183-188 (Ex. 1011);

Clifford J. Weinstein *et al.*, *Experience With Speech Communication In Packet Networks*, 1 IEEE JOURNAL ON SELECTED AREAS IN COMMUNICATIONS, SPECIAL ISSUE ON PACKET SWITCHED VOICE AND DATA COMMUNICATIONS, 963-980 (1983) (Ex. 1012);

T. Ramteke, NETWORKS, 3, 4, 10, 58-60, 136-138, 245-247, 292-293, and 384 (1984) (Ex. 1014);

D. Cohen, RFC 741—Specifications for the Network Voice Protocol (NVP), Nov. 22, 1977. (Ex. 1015);

NSF Network News, *NSFNET Acceptable Use Policy*, National Science Foundation, Washington, D.C., 4 and 11, available at http://old.cni.org/docs/infopols/NSF.html (Ex. 1016);

S. Halabi, INTERNET ROUTING ARCHITECTURES, i-x, and 5-35 (2nd ed. 2000) (Ex. 1017);

NEWTON'S TELECOM DICTIONARY, 30, 211, 554, 643, 706, 827, 933, and 1014 (1994) (Ex. 1018); and

R.F. Rey, ENGINEERING AND OPERATIONS IN THE BELL SYSTEM, 52-56 (2nd ed. 1983) (Ex. 1019).

### E. *The Asserted Grounds*

Petitioner alleges that claims 1-9 and 11-15 are anticipated under 35 U.S.C. § 102(e) by Gordon, and claims 1-15 are unpatentable under 35 U.S.C. § 103(a) based upon the listed references in various combinations. The specific grounds asserted by Petitioner are detailed in the table below:

| Claims | Statutory Basis | Applied Reference(s) |
|---|---|---|
| 1-9 and 11-15 | 35 U.S.C. § 102(e) | Gordon |
| 6 | 35 U.S.C. § 103(a) | Gordon and Iwami |
| 8, 9, 11, and 12 | 35 U.S.C. § 103(a) | Gordon and Kobayashi |
| 10 | 35 U.S.C. § 103(a) | Gordon, Kobayashi, and Chau |
| 1-8, 12, 14, and 15 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, and Weinstein |
| 1-8, 12, and 15 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, Weinstein, and Iwami |

| | | |
|---|---|---|
| 8, 9, and 11-13 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, Weinstein, and Kobayashi |
| 10 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, Weinstein, Kobayashi, and Chau |
| 1-7 and 15 | 35 U.S.C. § 103(a) | Kammerl and Iwami |
| 8, 9, and 11-13 | 35 U.S.C. § 103(a) | Kammerl, Iwami, and Kobayashi |
| 10 | 35 U.S.C. § 103(a) | Kammerl, Iwami, Kobayashi, and Chau |
| 14 | 35 U.S.C. § 103(a) | Kammerl, Iwami, and Gordon |

## II. CLAIM CONSTRUCTION

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b); *see also Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012) (*Claim Construction*). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Nevertheless, a "claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or

prosecution history." *Id*. Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a special definition or other consideration, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).[2]

Petitioner and Patent Owner propose particular constructions for several claim terms. Patent Owner states that two of its proposed constructions differ materially from those proposed by Petitioner. *See, e.g.*, Prelim. Resp. 4. Patent Owner contends that, given the interpretation of certain claim terms, Gordon alone does not disclose each and every element of challenged claims 1-9 and 11-15 and that the asserted combinations of the applied references would not have taught or suggested all of the limitations of challenged claims 1-15. *Id*. at 1. In particular, Patent Owner contends that, in view of the interpretation of the claim terms "internet protocol" and "signaling message," the challenged claims are neither anticipated nor rendered unpatentable by the applied art. *Id.* To determine whether to institute an *inter partes* review, we construe the claim terms that Patent

---

[2] We note that the '879 Patent is set to expire on October 11, 2014. While the Board applies the broadest reasonable interpretation standard to the claims of an unexpired patent, the claim interpretation standard for an expired patent may be different. *See In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012) ("the Board's review of the claims of an expired patent is similar to that of a district court's review").

Owner relies upon to distinguish the challenged claims over the applied references and to which terms Petitioner ascribes alternative constructions.

*A. An internet protocol*

Claim 1 recites that the claimed method comprises the step of "performing a first conversion converting the transmission from the first format to a second format, *the second format being an internet protocol*." Claim 1 further recites that this second format is for sending the converted transmission through a second communication network (i.e., a data network). The Specification of the '879 Patent does not define expressly the term "internet protocol." Nevertheless, referring to Figure 2, the Specification states that:

> Both servers 60, 62 are networked *using transmission control protocol/Internet protocol TCP/IP, which is a set of protocols that link dissimilar computers across a variety of other networks and protocols as conventionally used on local area networks, minicomputers and mainframes*, or are networked with a router in the case of an ATM.

Ex. 1001, col. 7, ll. 45-50 (emphasis added). Thus, internet protocols, such as TCP/IP, link computers across a variety of networks and protocols and are an alternative to protocols used with an ATM network. The Specification further explains that:

> Other applications of the invention concern transmissions through conventional switched frame relay, conventional switched asynchronous transfer mode and other conventional

> data networks such as the Internet. Frame relay is an international standard for efficiently handling high-speed data over wide area networks that uses network bandwidth only when there is traffic to send. Asynchronous transfer mode allows users to combine voice, video and data on a single phone line and operates at up to Gigabyte-per-second speeds in which usable capacity is segmented into fixed-size cells each consisting of header and information fields allocated to services on demand. *The Internet network differs from frame relay switching and asynchronous transfer mode [ATM] by using internet protocols* such as transmission control protocol/Internet protocol (TCP/IP), which is a set of protocols developed by the Department of Defense to link dissimilar computers across a variety of other networks and protocols.

Ex. 1001, col. 7, ll. 23-39 (emphasis added). Moreover, as noted above, with respect to Figure 9, the Specification distinguishes between the conversion of telecommunication transmissions for transmission over a data network, such as data network 20, and for transmission over another network 200, such as a cellular, ATM, or frame relay network. *Id.* at col. 14, ll. 29-36.

Relying upon the Declaration of Dr. Vincent C. Jones (Ex. 1002), Petitioner proposes a broad construction of the term "internet protocol." Pet. 7-8 (citing Ex. 1002 ¶¶ 39-41). Specifically, Petitioner argues that the term "internet protocol" means "a set of rules, procedures or conventions relating to format and timing of data that allows communications between networks." *Id.* at 7 (quoting Ex. 1002 ¶ 41). Although Dr. Jones acknowledges that the Specification indicates that an Internet network "differs" from frame relay switching and ATM "by using internet protocols"

(Ex. 1002 ¶ 39 (quoting Ex. 1001, col. 7, ll. 34-39)), Dr. Jones relies instead upon the definitions of the words “internetworking” and “protocol” (*see id.* at ¶ 40 (citing Ex. 1014 and Ex. 1018)) in formulating Petitioner’s construction of the term “internet protocol.” We disagree with this construction, as it is overly broad and fails to take proper account of the Specification.

Patent Owner contends that, in view of the Specification, the term “internet protocol” must be construed to “satisfy three requirements: (1) that it be the type of protocol used on the Internet; (2) that it include TCP/IP; and (3) that it ***not*** be an ATM or a frame relay protocol.” Prelim. Resp. 8-9. Patent Owner relies on extrinsic evidence (Prelim. Resp. 8-10 (citing Ex. 2002 and Ex. 2003)) to conclude that the term “datagram protocol” satisfies these requirements and that “the broadest reasonable interpretation of ‘an internet protocol’ in the context of the ’879 patent is simply ‘a datagram protocol’” (*id.* at 7-8). We note, however, that the term “datagram protocol” does not appear in the Specification, and we determine that it is unnecessary to introduce this new term in order to construe the term “internet protocol.”

We are persuaded that based on the term’s usage in the Specification, an “internet protocol” must satisfy the three requirements identified by Patent Owner. *Id*. at 8-9. Moreover, as Petitioner notes, the ordinary meaning of the term “protocol” is “a specific set of rules, procedures or conventions relating to format and timing of data transmission between two devices.” Ex. 1002 ¶ 37 (quoting Ex. 1018, p. 827). Therefore, for

purposes of this decision, we construe the term "internet protocol" as a set of rules, instructions, or procedures relating to the format and timing of data transmissions between two devices over the Internet, such as TCP/IP. The term "internet protocol," as used in the claims of the '879 Patent, does *not* encompass ATM and frame relay protocols.

### *B. Signaling messages*

Dependent claim 15 recites that "the transmission [of claim 1] comprises *signaling messages*" (emphasis added). Unlike the term "internet protocol," the term "signaling messages" does not appear in the Specification. Petitioner's declarant, Dr. Jones, proposes a construction of the term "signaling messages" based on the use of "signaling" in an extrinsic source (Ex. 1014, p. 58) and the separate definitions of the words "messages" (Ex. 1018, p. 643) and "signaling" (Ex. 1014, p. 58; Ex. 1018, p. 933) in a contemporary dictionary of telecommunications terms. Ex. 1002 ¶¶ 48-49. Petitioner argues that the term "signaling messages" means "control information exchanged between two points in a network to establish, maintain, and remove a connection," but Petitioner's construction does not distinguish between information controlling the establishment of the call and the speech content of the call. *See* Pet. 8 (citing Ex. 1002 ¶¶ 48-50).

Patent Owner contends that Petitioner's proposed construction of this term is overly broad because it fails to take into account the context in which

the term is used in claim 15 and its relation to the term "transmission" in independent claim 1. Prelim. Resp. 12-13. In particular, Patent Owner objects that Petitioner's construction "fails to limit the scope of a 'signaling message' to phone call connections." *Id.* at 13. Instead, Patent Owner contends that the broadest reasonable interpretation of the term "signaling message" is "control information exchanged between two points in a network to establish, maintain and remove a phone call *as distinguished from conversation information exchanged between a caller and a call recipient over an already established phone call*." *Id.* at 15 (emphasis added).

Patent Owner contends that the "transmission" of claim 1 comprises "signaling messages" and that, because the "transmission" is in a "first format comprising a telecommunication protocol for establishing and transmitting voice communication for a phone call," the "signaling messages" are related specifically to control of a phone call *connection*. *Id.* at 13. Consequently, Patent Owner contends that this construction is consistent with the Specification, which provides that "control information in the form of an inquiry of the availability status of the party to be called may be sent through different networks by routing it through a control location of the inventive system that converts it into compatible form." *Id.* (quoting Ex. 1001, col. 2, ll. 4-12).

Although both Petitioner and Patent Owner agree that the term "signaling messages" is construed properly to include "control information

exchanged between two points in a network to establish, maintain and remove" a phone call or a telephone connection (Pet. 8; Prelim. Resp. 13), Patent Owner attempts to distinguish these signals *in time* from speech or conversation information exchanged between the calling party and the called party. We discern no such distinction in the language of claim 1 or 15 or in the Specification. Claim 15 further limits the "transmission" of claim 1 to comprise "signaling messages," but claim 1 recites that the "transmission" is transmitted in a first format (e.g., telecommunications protocol) and that the transmission then is converted to a second format (e.g., internet protocol). Therefore, for purposes of this decision, we construe the term "signaling messages" to mean control information exchanged between two points in a network to establish, maintain, and remove a telephone connection.

### *C. Additional construed terms*

Petitioner proposes constructions of the terms "access device," "telecommunication protocol," "telecommunication node," "selecting a route for the transmission based on at least one criteria defined by user preference," and "selecting a route for the transmission based on credit availability of a calling party." Pet. 6-7. Specifically, Petitioner argues that these terms "are to be given their broadest reasonable interpretation, as understood by one of ordinary skill in the art and consistent with the disclosure. 37 C.F.R. § 42.100(b)." *Id.* at 6. We determine that Petitioner's proposed constructions of these terms are consistent with their ordinary and customary meanings (*see* Ex. 1002 ¶¶ 35-38 and 42-47) and are not

inconsistent with the use of these terms in the Specification. Thus, we are persuaded by Petitioner's proposed construction of these terms, as follows:

| Claim Term | Petitioner's Construction |
|---|---|
| *access device* | any device that allows entry to a circuit or other communications facility such as a voice or data network |
| *telecommunication protocol* | a specific set of rules, procedures or conventions relating to format and timing of a communication |
| *telecommunication node* | a point of connection in a telecommunication network |
| *selecting a route for the transmission based on at least one criteria defined by user preference (Claim 8)* | choosing a transmission route for a communication based on a user's criteria |
| *wherein the at least one criteria [of claim 8] comprises credit availability of a calling party (Claim 10)* | choosing whether to transmit or disconnect a call based on a credit availability |

Pet. 7-8. Moreover, Patent Owner does not propose alternative constructions for these terms. *See* Prelim. Resp. 4 ("This section identifies selected ones of those overly broad definitions. . . . Patent Owner reserves the right to contest any or all of the claim term proposals set forth in the Petition, whether or not they are specifically addressed below."). Therefore, for purposes of this decision, we construe these additional claim terms in the manner proposed by Petitioner.

## III. DECISION TO INSTITUTE

For the reasons described below, we institute an *inter partes* review on the grounds that each of claims 1-15 is unpatentable over the combination of Kammerl and Iwami, alone or in further combination with Kobayashi, Chau, or Gordon.

## IV. GROUNDS FOR REVIEW

### *A. Priority Date for the '879 Patent Claims*

The '879 Patent, issued from U.S. Patent Application No. 11/895,460 filed August 24, 2007, is a continuation of a series of three applications, the last of which is a continuation-in-part of U.S. Patent Application No. 08/320,269 (the "'269 Application"), filed October 11, 1994. Ex. 1001, col. 1, ll. 7-14. Gordon and Iwami have U.S. filing dates of February 13, 1995, and December 13, 1994, respectively. Ex. 1005 (Item [22] on face page); Ex. 1006 (Item [22] on face page). Initially, we note that Petitioner only may request *inter partes* review based on statutory grounds under 35 U.S.C. §§ 102 or 103 based on patents or printed publications. 37 C.F.R. § 42.104(b)(2). Petitioner must identify the references relied upon in support of its challenge to the claims of the '879 Patent. *Id.*

Petitioner argues that the '879 Patent is not entitled to the benefit of the earliest date, October 11, 1994, to which the applicant claimed priority under 35 U.S.C. § 120. Pet. 10-11. In particular, Petitioner notes that Dr. Jones opined that "the '269 application would not have conveyed to a

person of ordinary skill in the art that the applicant was in possession of *the subject matter claimed* in the ’879 patent at the time that the ’269 application was filed.” *Id.* at 10 (emphasis added; citing Ex. 1002 ¶¶ 51-58). Moreover, Petitioner argues that the ’269 Application does not mention the term “internet protocol” and that, based on Dr. Jones’s review, the ’269 Application does not provide support for the use of an “internet protocol.” *Id.*

Although Patent Owner notes that the ’879 Patent claims an earliest priority date of October 11, 1994, Patent Owner does not rely on this priority date to distinguish the cited references, and, in particular, to distinguish Gordon and Iwami, over the challenged claims. Prelim Resp. 2 n.1. Rather, Patent Owner states that it “reserves the right to present evidence and argument in support of the October 11, 1994, priority claim.” *Id.*

We are not persuaded that, because the term “internet protocol” does not appear in the ’269 Application, the ’269 Application lacks support for that term. *See* Ex. 1002 ¶ 52. Moreover, because we do not adopt Petitioner’s construction of the term “internet protocol,” Dr. Jones’s opinion as to whether a person skilled in the relevant art would have understood the applicant to have been “in possession of any of the claims of the ’879 patent when the ’269 application was filed” also is not persuasive. *See id.* at ¶ 58.

Nevertheless, Dr. Jones correctly observes that Figures 2-6, 7A-7G, 8, and 9 of the ’879 Patent, and their corresponding descriptions in the ’879 Patent, are not included in the ’269 Application. *Id.* at ¶ 52. Further, Patent

Owner indicates that Figure 9 of the ’879 Patent provides an overview of the claimed invention. Prelim. Resp. 3. Moreover, figures corresponding to Figures 2-6, 7A-7G, 8, and 9 of the ’879 Patent first appear in U.S. Patent Application No. 08/727,681, now issued as Patent No. US 6,188,756 B1, *filed October 8, 1996*. Ex. 3001. Based on the current record, and in view of Patent Owner’s failure to contest Petitioner’s challenge to the priority date of the’879 Patent, we determine that Petitioner has demonstrated a reasonable likelihood that the claims of the ’879 Patent are not entitled to the October 11, 1994, filing date of the ’269 Application. Therefore, for purposes of this decision, we ascribe an effective filing date of October 8, 1996, for each challenged claim. Consequently, Petitioner has demonstrated a reasonable likelihood that Gordon and Iwami are prior art references under 35 U.S.C.
§ 102(e), and we decide whether to institute an *inter partes* review based on consideration of all of the cited references.

*B. Unpatentability Due To Obviousness*

*1. Kammerl and Iwami*

Petitioner argues that Kammerl discloses all of the limitations of independent claim 1, except for “the second format being an internet protocol.” Pet. 47-52. Petitioner argues, however, that Iwami clearly teaches a second format that is an internet protocol. *Id.* at 49. Petitioner argues that, referring to Iwami’s Figure 1, “Iwami discloses using the Internet Protocol for establishing and transmitting voice communications for

a phone call. In particular, Iwami's system allows a telephone connected through a public telephone network to place a call across a packet-switched network to a terminal connected through a Local Area Network (LAN)." *Id*. at 41 (citing Ex. 1006, col. 1, ll. 55-60, col. 11, ll. 19-25, col. 12, ll. 52-59).

As Iwami further explains:

> *the LAN communication controller 14 shown in FIG. 2 may be adapted to simultaneously support a plurality of communication protocols, for example, TCP/IP protocol and UDP/IP protocol*, such that the voice communication packet is transmitted utilizing the UDP/IP protocol . . . and *control information such as the voice communication request command and voice communication end notice command* shown in FIG. 5 *and the connected terminal determination result notice command* shown in FIG. 19 *are transmitted utilizing the TCP/IP protocol.* The appropriate use of different protocols in this way will . . . reliably control the start, termination, and so on of the voice communication.

Ex. 1006, col. 17, ll. 44-58 (emphases added). Petitioner argues that a person of ordinary skill in the relevant art:

> would have understood that Internet Protocol as taught by Iwami could be used over the ATM network taught by Kammerl. Doing so would have allowed Kammerl's voice communications to be transmitted on networks other than ATM networks. This is the reason that internetworking or internet protocols such as the Internet Protocol were developed—to allow internetworking of diverse networks.

Pet. 49-50 (citing Ex. 1002 ¶ 227) (citations omitted).

Finally, referring to Figure 2, reproduced below, Kammerl depicts a second example of a broadband communications network, such that a number of network transfers are provided in different transmission directions. Ex. 1013, col. 5, ll. 33-36.

FIG 2




As depicted in Figure 2 above, three interworking units (NUE1, NUE2, and NUE3) are connected to a packet switching network PN and to a telephone switching network AN. *Id.* at ll. 36-39. Each of the three interworking units is connected to one of three different telephone exchanges (AVST1, AVST2, and AVST3) by way of a trunk group for each. *Id.* at ll. 39-42. Moreover, Kammerl teaches that the broadband communications network depicted in Figure 2 may be modified, such that

packet switching network PN is connected as a transit network by way of interworking units between two telephone switching networks. *Id.* at ll. 57-61. Thus, Petitioner argues that Kammerl teaches the "sending" and "performing" steps of independent claim 1. Pet. 50-52.

Patent Owner objects to Petitioner's proposed combination of Kammerl and Iwami for two reasons. First, Patent Owner contends that Kammerl and Iwami fail to teach or suggest all of the limitations of claim 1. Prelim. Resp. 52-54. Initially, Patent Owner contends that Iwami does not teach or suggest "performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device," as recited in claim 1. *Id.* at 53. Instead, Patent Owner contends that, at most, Iwami's communication server performs "a conversion from a first to a second format, but does not perform a second conversion to a further format." *Id.* (citing Ex. 1006, col. 3, ll. 4-10). We note, however, that Petitioner relies on Kammerl, *not* Iwami, as teaching the step of "performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device." Pet. 51-52.

Patent Owner further contends that, assuming *arguendo* that Kammerl teaches the second conversion, Kammerl's second conversion would be performed "in the context of an ATM network." Prelim. Resp. 53. As noted above, however, Petitioner relies on Iwami, *not* Kammerl, to teach or suggest the "internet protocol" recited in claim 1. Pet. 49-50. Thus, we are

not persuaded that Kammerl and Iwami fail to teach all of the limitations of challenged claim 1.

Second, Patent Owner contends that a person of ordinary skill in the relevant art would not have had a reason to combine the teachings of these references in the manner proposed by Petitioner. Prelim. Resp. 54-57. In particular, Patent Owner contends that a person of ordinary skill in the relevant art would not have modified the teachings of Kammerl in view of the teachings of Iwami to teach conversion to an internet protocol "because: (i) Kammerl teaches away from such a modification; (ii) the modification renders Kammerl's system inoperable for its intended purpose; and (iii) the Petitioner's stated reason in support of this proposed modification is nonsensical." *Id.* at 55.

A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant. *In re Gurley*, 27 F.3d 551, 53 (Fed. Cir. 1994). "The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000); *see DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d

1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away . . . if it merely expresses a general preference for an alternative invention.").

Kammerl states that "[t]he problem which the present invention overcomes is [to] reduce the lag times due to the packet switching network in transmission of speech signals at least partially in a packet switching network." Ex. 1013, col. 1, ll. 57-60. Patent Owner contends that modifying Kammerl's system to include using Iwami's TCP/IP protocol would increase, not reduce, lag times. Prelim. Resp. 55. Patent Owner, however, does not provide sufficient and credible evidence that packet-switching networks, such as those employing TCP/IP, must incur increased lag times when compared to ATM networks. *See id.* Further, we note that Kammerl describes using an ATM network with respect to a preferred embodiment of the invention. Ex. 1013, col. 3, ll. 35-41. Kammerl's independent claims, however, are not limited to ATM networks, and we conclude that Kammerl's disclosure is broader than the general preference expressed in the preferred embodiment. Thus, based on the current record, we are not persuaded that Kammerl teaches away from its combination with Iwami.

Similarly, Patent Owner does not provide sufficient and credible evidence that the modification of Kammerl to include the use of an internet protocol, rather than ATM, would render Kammerl's invention unsuitable for its intended purpose. Regarding the use of TPC/IP protocols, Iwami states that "[t]he appropriate use of different protocols in this way will

*prevent a delay in the arrival of the voice communication packets* and reliably control the start, termination, and so on of the voice communication." Ex. 1006, col. 17, ll. 55-58.

Finally, Patent Owner contends that Petitioner's stated reason for combining the teachings of Kammerl and Iwami is "nonsensical." Prelim. Resp. 56. As noted above, Petitioner argues that a person of ordinary skill in the relevant art:

> would have understood *that Internet Protocol as taught by Iwami could be used over the ATM network taught by Kammerl*. . . . Doing so would have allowed Kammerl's voice communications *to be transmitted on networks other than ATM networks*. . . . This is the reason that internetworking or internet protocols such as the Internet Protocol were developed to allow internetworking of diverse networks.

Pet. 49 (emphases added). Patent Owner contends that "sending the voice signals as IP packets over the ATM network does not perform any type of internetworking function, as the IP packets are merely transported intact across the ATM link and extracted on the other side." Prelim. Resp. 56-57. Based on the current record, however, we see no reason why Internet Protocol packets, as taught by Iwami, could not be transmitted over the ATM network taught by Kammerl, and we are persuaded by the analysis set forth by Petitioner and Dr. Jones. *See* Pet. 49 (citing Ex. 1002, ¶ 227). Thus, we are not persuaded that Petitioner's reason for combining Kammerl and Iwami is "nonsensical."

In view of the foregoing discussion, we are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of independent claim 1. We also are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claims 2-7 and 15 of the ’879 Patent as unpatentable over Kammerl and Iwami. Pet. 52-55. Patent Owner in its preliminary response does not argue these claims separately, but instead relies upon its arguments regarding the base claim, claim 1, to distinguish over the combined references.

*2. Kammerl, Iwami, and Kobayashi*

Petitioner argues that Kammerl, Iwami, and Kobayashi teach all of the limitations of dependent claims 8, 9, and 11-13. Pet. 56-58. In particular, claim 8 recites that the method of claim 1 “further compris[es] the step of selecting a route for the transmission based on at least one criteria defined by user preference.” Each of claims 9 and 11 depends directly from claim 8 and recites that the at least one criteria comprises “a specified level of transmission quality” and the “cost of routing,” respectively.

With respect to claims 8, 9, and 11, Petitioner argues that Kammerl is directed to providing voice-over-packet networks in order to improve the “quality of speech signal transmissions.” Pet. 56 (quoting Ex. 1013, col. 1, ll. 34-35). Further, Petitioner argues that “Kobayashi teaches a method of improving transmission *quality by routing* on the basis of the recorded preferences of users of the network.” *Id.* (emphasis added; citing Ex. 1007,

col. 3, ll. 20-25 (“conditions dependent on the respective tenants”)). Thus, Petitioner concludes that Kammerl, Iwami, and Kobayashi teach all of the limitations of each of claims 8, 9, and 11.

Claim 12 recites that, in the method of claim 8, “the transmission comprises execution of a call setup procedure.” Petitioner argues that Kammerl teaches executing a call setup procedure “that involve[s] inserting signaling procedure signals from subscriber’s sets into packets and relaying them between the subscriber’s sets.” Pet. 57-58 (citing Ex. 1013, col. 3, ll. 41-55). Thus, Petitioner argues that Kammerl, Iwami, and Kobayashi teach all of the limitations of each of claims 8 and 12.

Claim 13 recites that the method of claim 1 “further compris[es] the step of storing at least one of subscriber information, rate schedules, and call details.” Petitioner argues that Kobayashi teaches that “the controller CONT determines the optimal route (least-cost route) by referring to a table stored in the memory MEM.” Pet. 58 (quoting Ex. 1007, col. 2, ll. 24-26). Petitioner further argues that a person of ordinary skill in the relevant art would have had reason to combine the teachings of Kobayashi with those of Kammerl and Iwami, so that users may be billed for their communication usage, based on predictable methodologies, such as those relying on stored subscriber information. *Id.* Thus, Petitioner argues that Kammerl, Iwami, and Kobayashi teach all of the limitations of claim 13.

Patent Owner does not dispute Petitioner’s mapping of the disclosure of Kobayashi or Kammerl on the limitations of claims 8, 9, 11, and 12, or

Petitioner's mapping of the disclosure of Kobayashi on the limitations of claim 13. Instead, Patent Owner contends that Petitioner fails to demonstrate (1) that Kammerl and Iwami teach all of the limitations of independent claim 1 and (2) that a person of ordinary skill in the art would have had reason to combine the teachings of Kammerl and Iwami to achieve the invention recited in claim 1. Prelim. Resp. 52-57. We are not persuaded by Patent Owner's contentions, for the reasons set forth above. Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claims 8, 9, and 11-13 of the '879 Patent as unpatentable over Kammerl, Iwami, and Kobayashi.

*3. Kammerl, Iwami, Kobayashi, and Chau*

Petitioner argues that Kammerl, Iwami, Kobayashi, and Chau teach all of the limitations of dependent claim 10. Pet. 58. Claim 10 depends directly from claim 8 and recites that the at least one criteria comprises "credit availability of a calling party." In particular, Petitioner argues that Chau teaches performing a credit check on callers. *Id.* Specifically, Chau teaches that "[t]he sponsor collects the caller response and may do a credit check on a caller using the provided information. If the credit check indicates that the call should not be accepted, then a suitable message is outputted to the caller and the call is terminated." Ex. 1008, col. 7, ll. 54-59. Moreover, Petitioner argues that modifying the teachings of Kammerl, Iwami, and Kobayashi to conduct a credit check on the caller *as at least one criteria*, as taught by Chau, would involve no more than applying known techniques to achieve a

predictable result. Pet. 58; *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.").

Patent Owner does not dispute Petitioner's mapping of the disclosure of Chau on the limitations of claim 10. Instead, Patent Owner contends that Petitioner fails to demonstrate (1) that Kammerl and Iwami teach all of the limitations of independent claim 1 and (2) that a person of ordinary skill in the art would have had reason to combine the teachings of Kammerl and Iwami to achieve the invention recited in claim 1. Prelim. Resp. 52-57. As noted above, we are not persuaded by Patent Owner's contentions. Consequently, we are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claim 10 of the '879 Patent as unpatentable over Kammerl, Iwami, Kobayashi, and Chau.

#### *4. Kammerl, Iwami, and Gordon*

Petitioner argues that Kammerl, Iwami, and Gordon teach all of the limitations of dependent claim 14. Pet. 58-59. Claim 14 depends directly from independent claim 1 and recites that, in the method of claim 1, "the transmission is related to a fax transmission." Petitioner argues that "Gordon teaches sending a fax transmission over a data network." *Id.* In particular, Gordon teaches that "a facsimile transmission addressed to a

particular address in Japan can effectively use the UniPost access system." Ex. 1005, col. 8, ll. 1-3; *see also* Ex. 1005, col. 8, 11-18 (using "the Internet data transmission system 4 to transfer the facsimile to the Tokyo UniPost Access Node 6"). Petitioner argues that modifying the teachings of Kammerl and Iwami to send a facsimile transmission as taught by Gordon, instead of a voice transmission, would involve no more than applying known techniques to achieve a predictable result. Pet. 59; *see KSR*, 550 U.S. at 416.

Patent Owner does not dispute Petitioner's mapping of the disclosure of Gordon on the limitations of claim 14. Instead, Patent Owner contends that Petitioner fails to demonstrate (1) that Kammerl and Iwami teach all of the limitations of independent claim 1 and (2) that a person of ordinary skill in the art would have had reason to combine the teachings of Kammerl and Iwami to achieve the invention recited in claim 1. Prelim. Resp. 52-57. As noted above, we are not persuaded by Patent Owner's contentions. Consequently, we are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claim 14 of the '879 Patent as unpatentable over Kammerl, Iwami, and Gordon.

### *C. Remaining Asserted Grounds of Unpatentability*

Petitioner asserts additional grounds of unpatentability with respect to claims 1-15, as listed in Section I.E above. Those additional grounds are denied as redundant in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable based on the grounds

of unpatentability, discussed above, on which we institute an *inter partes* review. *See* 37 C.F.R. § 42.108(a).

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claims 1-15 of the ’879 Patent.

## VI. ORDER

For the reasons given, it is

ORDERED that the petition is *granted* as to claims 1-15 of the ’879 Patent and that, pursuant to 35 U.S.C. § 314, an *inter partes* review of the ’879 Patent is hereby instituted for the following grounds:

Claims 1-7 and 15 under 35 U.S.C. § 103(a) as unpatentable over Kammerl and Iwami;

Claims 8, 9, and 11-13 under 35 U.S.C. § 103(a) as unpatentable over Kammerl, Iwami, and Kobayashi;

Claim 10 under 35 U.S.C. § 103(a) as unpatentable over Kammerl, Iwami, Kobayashi, and Chau; and

Claim 14 under 35 U.S.C. § 103(a) as unpatentable over Kammerl, Iwami, and Gordon.

FURTHER ORDERED that the petition for *inter partes* review based on each of the other asserted grounds is *denied*.

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '879 Patent is hereby instituted commencing on the entry date of this Order, and, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2:00 PM EST on December 2, 2013. The parties are directed to the *Office Trial Practice Guide*, 77 Fed. Reg. at 48765-66, for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

PETITIONER:

Michael B. Ray
Jon E. Wright
Sterne, Kessler, Goldstein & Fox, P.L.L.C.
mray-ptab@skgf.com
jwright-ptab@skgf.com

PATENT OWNER:

John C. Phillips
W. Karl Renner
Roberto J. Devoto
Fish & Richardson P.C.
Phillips@fr.com;
axf@fr.com;
Devoto@fr.com
IPR38460-0002IP1@fr.com